## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **KRISTA DYANNE LONGERMAN,** | ) | |
| | ) | **Case No. 11 CV 383** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | **October 28, 2011** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Plaintiff Krista Longerman ("Longerman") seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Before the court are the parties' cross-motions for summary judgment. Longerman asks the court to reverse the Commissioner's decision and award benefits, or in the alternative, to remand the case for further proceedings. The Commissioner seeks an order affirming the decision. For the following reasons, Longerman's motion for summary judgment is granted insofar as it requests a remand, and the Commissioner's motion is denied:

### I. Procedural History

Longerman applied for DIB and SSI on September 17, 2007, alleging that she became disabled on January 1, 2007, due to chronic headaches, depression, and anemia.

(Administrative Record ("A.R.") 62, 102-04, 105-06.) Her applications were denied initially

on December 21, 2007, (id. at 52, 53, 58-62), and again on reconsideration on March 21,

2008, (id. at 54, 55, 64-67, 68-71). Thereafter, Longerman requested and received a hearing

before an administrative law judge ("ALJ"). (Id. at 34-49, 73.) On January 27, 2010, the

ALJ issued a decision finding Longerman not disabled. (Id. at 15-23.) The Appeals Council

denied Longerman's request for review on November 23, 2010, making the ALJ's decision

the final decision of the Commissioner. (Id. at 1-3.) *See Getch v. Astrue*, 539 F.3d 473, 480

(7th Cir. 2008). Pursuant to 42 U.S.C. § 405(g), Longerman initiated this civil action for

judicial review of the Commissioner's final decision. The parties have consented to the

jurisdiction of this court pursuant to 28 U.S.C. § 636(c).

## II. Background

### A. Summary of Medical Evidence

#### 1. Migraine Headaches

Longerman, who is 33 years old, has been suffering from chronic migraine headaches

since she was 16 years old. In March 1994, she first sought treatment for her headaches from

Dr. Donald Kuhlman, a neurologist. (A.R. 46, 488-89.) About 12 years later, in June 2006,

Dr. Kuhlman diagnosed Longerman with longstanding migraine headaches, which were

"somewhat suboptimally controlled."[1] (Id. at 419.) In September 2006, Dr. Kuhlman noted

that Longerman's chronic headaches were reasonably well-controlled with medication, but

---

[1] The parties have not presented any medical facts for the 12-year period between March
1994 and June 2006.

because of the severity of her headaches, he added another medication to Longerman's treatment regimen. (Id. at 418.) Two months later, in November 2006, Dr. Kuhlman opined that Longerman suffers from severe chronic headaches and increased the dosage of one of her medications. (Id. at 417.) In December 2006, Dr. Kuhlman observed in his treatment notes that Longerman's headaches were "largely unchanged" and he continued her then-current medications. (Id. at 416.)

Dr. Kuhlman's April 2007 treatment notes show that Longerman's headaches had improved since she began taking Avinza (morphine).[2] (Id. at 415.) She reported a significant decrease in both the frequency and severity of her headaches. (Id.) Dr. Kuhlman diagnosed chronic headaches, which were relatively stable at that time, and continued her treatment regimen consisting of four different headache medications (including morphine) and two anti-depressants. (Id.)

About three months later, in July 2007, a physician at a pain clinic prescribed Ketoconazole,[3] because the pain specialist believed that Longerman's chronic headaches were related to an undiagnosed systemic candida infection. (Id. at 413.) Dr. Kuhlman's notes indicate that in September 2007 Longerman discontinued using Ketoconazole because it was not beneficial to her. (Id. at 411.) Treatment notes show that Longerman continued

---

[2] Avinza is used to treat moderate to severe pain requiring continuous, around-the clock therapy. *See* http://www.drugs.com/avinza.html (last visited Oct. 28, 2011).

[3] Ketoconazole is used to treat fungal infections. *See* http://www.drugs.com/mtm/ketoco-nazole.html (last visited Oct. 28, 2011).

to experience headaches several times a week and that recent adjustments were made to the dosage of her anti-depressants. (Id.) Dr. Kuhlman opined that Longerman has longstanding severe chronic headaches, which were refractory to a wide spectrum of prophylactic and abortive medications. (Id.) In October 2007, Longerman again complained that she continued to have headaches several times a week. (Id. at 575.) She was taking MS Contin[4] and Norco[5], which had been prescribed by her pain specialist. (Id.)

In February 2008, Longerman reported to Dr. Kuhlman that, despite taking numerous medications, she continued to have headaches on a daily basis and had significant discomfort for at least 12 hours out of each 24-hour period. (Id. at 823.) Dr. Kuhlman's treatment notes indicate that Longerman was taking five different pain medications each day to treat her severe headache pain. (Id.) He indicated that Longerman continued to have chronic headaches that were refractory to multiple preventative medications and explained that she is on an "unusual medical regimen . . . which seems to be about as effective (or ineffective) as anything else which has been tried recently." (Id.)

Two months later, in April 2008, Longerman reported that she was participating in a headache study at the University of Illinois, which involved the implantation of an occipital nerve stimulator. (Id. at 822.) The following month, she underwent surgery to implant

---

[4] MS Contin is used to treat moderate to severe pain requiring continuous, around-the-clock therapy. *See* http://www.drugs.com/ms_contin.html (last visited Oct. 28, 2011).

[5] Norco is used to treat moderate to severe pain. *See* http://www.drugs.com/norco.html (last visited Oct. 28, 2011).

occipital nerve stimulation electrodes. (Id. at 869-71.) About five months later, in October 2008, she reported that the stimulator was helpful in reducing the severity of her headaches, but she still continued to have headaches. (Id. at 820.) Even though Longerman was participating in the clinical trial, she continued with her then-current treatment regimen. (Id. at 855-56.) Dr. Kuhlman's treatment notes indicate that Longerman was taking four different pain medications and two anti-depressants. (Id. at 820.) Dr. Kuhlman recommended that Longerman see "a specialty pain physician to oversee and manage the use of her chronic long and short-term narcotics." (Id. at 821.)

In June 2009, Dr. Kuhlman completed a Headaches Impairment Questionnaire at the request of Longerman's attorney. (Id. at 838-43.) He noted that Longerman has daily chronic refractory migraine headaches of moderate to severe intensity that typically last from one to eight hours. (Id. at 838-39.) Her symptoms include mood changes and photosensitivity. (Id. at 839.) Stress and hunger triggered her headaches. (Id. at 839-40.) Dr. Kuhlman had been unable to relieve Longerman's pain despite substituting medications to relieve her symptoms. (Id. at 841.) He opined that her pain and other symptoms were frequently severe enough to interfere with her attention and concentration and estimated that Longerman would be absent from work for more than three days a month and she was capable of performing only low-stress jobs. (Id. at 841-42.) He marked that when she experienced a headache she could not perform even basic work activities.[6] (Id. at 842.)

_____

[6] The questionnaire asked, "[d]uring times your patient had a headache, would he/she generally be precluded from performing even basic work activities and need a break from the

Dr. Kuhlman also noted that Longerman suffers from psychological limitations that also affect her ability to work on a sustained basis. (Id.)

## 2. Depression

Longerman also has received treatment for depression for a number of years. In September 2007, she underwent a psychiatric evaluation with Dr. Jerry Gibbons. (A.R. 658-60.) At that time, Longerman complained of feeling depressed and reported that she had been hospitalized in March 2007 following a suicide attempt. (Id. at 658, 719-20.) Because her mental status examination was indicative of a depressed mood, Dr. Gibbons prescribed an anti-depressant and recommended that Longerman continue with her individual therapy sessions. (Id. at 659-60.) Dr. Gibbons assessed Longerman's overall level of functioning and assigned her a Global Assessment of Functioning ("GAF") score of 55.[7] (Id. at 659.) Dr. Gibbons diagnosed major depressive disorder (single episode), obesity, status post-gastric bypass surgery, migraine headaches, and anemia. (Id.)

In October 2007, Longerman's mood had improved, but she was having vivid dreams and experiencing hypersomnia (excessive amounts of sleepiness). (Id. at 670.) In December

---

workplace?" (A.R. 842.) Then the questionnaire gave two options, "Yes," or "No." (Id.) Dr. Kuhlman checked "Yes." (Id.)

[7] The GAF includes a scale ranging from zero to 100, and is a measure of an individual's "psychological, social, and occupational functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) ("DSM-IV-TR"). A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

2007, she complained of feeling depressed, being sick a lot, and having less energy. (Id. at 676.) Dr. Gibbons noted that Longerman's mood was depressed and he increased her anti-depressant dosage. (Id.) A month later, Longerman's depression had not improved. (Id. at 679.)

Next, in March 2008, Margaret Wharton, Psy.D., a state agency psychologist, reviewed Longerman's medical file and completed forms assessing her mental residual functional capacity ("RFC") to perform work-related activities. (Id. at 635-52.) Dr. Wharton opined that Longerman's cognitive and attention skills are intact and adequate for "simple one-two step work tasks as well as detailed tasks." (Id. at 651.) She described Longerman's mental status and adaptive skills as being within normal limits, but her interpersonal skills were moderately limited by depressive symptoms. (Id.) In assessing the degree of Longerman's functional limitations, Dr. Wharton opined that she has mild restrictions in her daily activities, mild difficulties in maintaining concentration, persistence, and pace, and moderate difficulties in maintaining social functioning. (Id. at 645.)

About one year later, in April 2009, Dr. Eva Kurilo, a psychiatrist, evaluated Longerman. (Id. at 886-88.) Longerman reported a long history of depression with symptoms of disrupted sleep, loss of enjoyment of activities, sadness, decreased concentration, fatigue, irritability, and some anxiety. (Id. at 886.) She had not worked since 2007, when she was fired from her job due to frequent absences related to her depression and migraine headaches. (Id. at 887.) Dr. Kurilo assessed Longerman's overall level of

functioning and assigned her a GAF score of 50.[8] (Id.) She diagnosed major depression (moderately severe and recurrent), migraine headaches, anemia, and status post-gastric bypass surgery. (Id.) Dr. Kurilo continued Longerman's anti-depressant medications and recommended psychotherapy. (Id. at 888.)

Several weeks later, in May 2009, Longerman continued to have problems with motivation and feeling tired. (Id. at 885.) Dr. Kurilo prescribed a new anti-depressant to help Longerman's symptoms. (Id.) Although in June 2009 Longerman reported that her medications were working well, a month later Dr. Kurilo noted that Longerman continued to have very poor stress tolerance, fluctuating anxiety, depression, and concentration problems. (Id. at 883-84.)

In July 2009, Dr. Kurilo completed a Psychiatric/Psychological Impairment Questionnaire at the request of Longerman's attorney. (Id. at 845-52.) She reported that Longerman's primary symptoms include depression, anxiety, and concentration problems beginning in 2007, when she attempted suicide. (Id. at 847, 852.) Dr. Kurilo explained that her clinical findings show that Longerman has a poor memory, mood disturbance, emotional lability, pervasive loss of interests, feelings of guilt or worthlessness, difficulty thinking or concentrating, decreased energy, generalized persistent anxiety, hostility, and irritability. (Id. at 846.) She diagnosed Longerman with major depression and she noted that her psychiatric

---

[8] A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

condition exacerbated her migraine headaches. (Id. at 845, 851.) Dr. Kurilo found Longerman's overall level of functioning to be consistent with a GAF score of 55. (Id. at 845.)

Dr. Kurilo assessed Longerman as being markedly limited[9] in her ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; (4) complete a normal workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and (5) respond appropriately to changes in a work setting. (Id. at 848-49.) She noted that Longerman experienced episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from that situation and experience exacerbation of her symptoms due to very poor stress tolerance, fluctuating sadness, anxiety, poor concentration, and frequent migraine headaches. (Id. at 850.) Dr. Kurilo opined that Longerman was incapable of tolerating even low stress work due to her depressive symptoms and migraine headaches and, as a result, she would be absent from work more than three times a month. (Id. at 851-52.)

## B.     Longerman's Testimony

At the hearing before the ALJ, Longerman described the multiple limitations she believes interfere with her ability to work. She explained that she has headaches every day

---

[9]  Markedly limited is defined as "effectively preclud[ing] the individual from performing the activity in a meaningful manner." (A.R. 847.)

of varying severity.  (A.R. 38-39.)  Her headaches typically last part of a day, but her more severe headaches will sometimes last for hours to days.  (Id. at 45.)  About once a week, she experiences intense throbbing headaches, which are so severe that she is unable to do anything.  (Id. at 39.)  When she has these types of headaches, she stays in a dark room by herself and does not get dressed or take a shower.  (Id. at 39, 41.)  She described difficulty thinking, concentrating, and focusing when she has a headache.  (Id. at 40.)  Although she does not have any problems walking, standing, sitting, or lifting on those days when she does not have a headache, she has difficulty falling asleep and staying asleep, even though she takes medicine to help her sleep.  (Id. at 41.)  Longerman most recently worked as an engineering assistant and estimated that she has been laid off from her last six or eight jobs because of frequent absences.  (Id. at 38, 45, 183-84.)  In her previous jobs she missed one day of work per week.  (Id. at 45.)

On headache-free days, Longerman is able to shop, cook, and perform household chores.  (Id. at 41-43.)  On days she has headaches, she is able to drive and watch children.  (Id. at 42-43, 45.)  Longerman does not like to drive on days she has severe headaches, but "sometimes it's unavoidable" if she develops a headache when she is already out and has to return home.  (Id. at 42.) She also takes care of a child who is almost five years old, but if she has a headache while caring for the child, she will let the child play by herself.  (Id. at 43, 45.) Longerman goes to restaurants, ball games, movies, and concerts on days when she does not have a headache and there is no heat or humidity.  (Id. at 43-44.)  She occasionally cross-

stitches pictures, reads magazines and newspapers, watches television, and uses her computer. (Id.)

About two years before the hearing, in October 2007, Longerman completed an Activities of Daily Living Questionnaire. (Id. 172-79.) She reported on the questionnaire that she performed household chores, which included among other things, cleaning the kitchen every day and doing laundry on a weekly basis. (Id. at 172.) Longerman indicated that she often watched children, worked on her hobbies, watched television, and listened to the radio. (Id. at 175.) She noted that she sometimes drove, read, fixed things, played cards or games, and socialized. (Id. at 174-75.) Longerman also performed volunteer activities, went to restaurants, and saw movies. (Id. at 175.) She, however, could not "do anything" two or three times a week when she had a bad headache and needed "to be left alone in [a] dark, quiet place." (Id. at 172, 175.) Longerman further indicated that her headaches affected her ability to bathe and groom herself. (Id. at 173.)

## C.    Vocational Expert's Testimony

The ALJ asked a vocational expert, Edward Pagella, whether an individual of Longerman's age, education, and work experience who is limited to unskilled work due to interference with concentration, persistence, and pace from headaches, and who should avoid concentrated exposure to noise, vibration, cold, heat, humidity, and wetness, could perform any jobs in the national economy. (A.R. 47-48.) Pagella concluded that the hypothetical person the ALJ described could perform light exertional work as a file clerk, general office clerk, and information clerk. (Id. at 48.) The ALJ next asked Pagella if there were any jobs

that the hypothetical individual could perform if that individual should have only occasional contact with the public. (Id.) Pagella stated that such an individual could perform light exertional work as a hand assembler, hand packer, and hand sorter. (Id.) He further indicated that there would be no work available for that individual if she would "be off task 20 percent of the time" and "missed two days a month" because of headaches. (Id. at 48-49.)

## D.    The ALJ's Decision

The ALJ evaluated Longerman's claim under the required five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920. She concluded that: (1) Longerman had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date of her disability; (2) her chronic migraine headaches and depression constitute severe impairments; (3) these impairments do not individually or collectively meet or equal a listed impairment; (4) Longerman has the RFC to perform a full range of work at all exertional levels but she must avoid concentrated exposure to noise, vibration, temperature extremes, humidity, wetness and is limited to unskilled work with occasional contact with the public; and (5) based on this RFC she cannot perform her previous work but can do unskilled light work as a hand assembler, hand packer, and hand sorter.

The ALJ denied benefits because she concluded that the objective medical evidence supported an RFC for a full range of work at all exertional levels (with some nonexertional limitations) and she found Longerman's statements regarding "the intensity, duration, and limiting effects" of her symptoms not credible. (Id. at 19-21.) The ALJ accorded "no significant weight" to the opinions of Dr. Kuhlman and Dr. Kurilo because, according to the

12

ALJ, there was no "medical documentation" supporting their opinions and both opinions were inconsistent with Longerman's daily activities. (Id. at 21.) The ALJ instead gave more weight to the opinion of the state agency consultant because her opinion was consistent with the record evidence. (Id.) The ALJ concluded that there was no evidence in the record to indicate that Longerman cannot perform at least simple unskilled work on a sustained basis that does not require a great deal of social interaction. (Id.) For these reasons, the ALJ concluded that the medical evidence did not corroborate Longerman's claimed limitations. (Id. at 19-21.) The ALJ did not address Pagella's testimony that if Longerman would be off task 20 percent of the time and missing two days of work each month then there would be no work available for her in the economy. (Id. at 48-49.)

## II. Analysis

In moving for summary judgment, Longerman challenges two aspects of the ALJ's decision. She first argues that the ALJ erred under the treating-physician rule by not according controlling weight to the opinions of Dr. Kuhlman and Dr. Kurilo. Alternatively, Longerman argues that, even if the ALJ did not err by giving her treating physicians' opinions less than controlling weight, she failed to analyze the required factors to determine what weight to assign to the opinions. Next, Longerman takes issue with the ALJ's credibility assessment contending that she erred when she assessed the credibility of her testimony only after she developed the RFC finding. Longerman further asserts that the ALJ's credibility determination was improper because she mischaracterized her daily

activities and did not consider the fact that she took narcotic medications for her severe headache pain.

This court must confine its review to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and determine whether the ALJ's decision is supported by substantial evidence, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

## A.     Treating Physician Rule

Longerman contends that the ALJ made a number of reversible errors in evaluating and weighing the medical evidence. She primarily asserts that the ALJ failed to give appropriate weight to the medical opinions of Dr. Kuhlman and Dr. Kurilo, when she credited the opinion of the state agency psychologist over those of her treating physicians. (R. 14, Pl.'s Mem. at 9-13.) The Commissioner defends that the ALJ reasonably declined to give controlling weight to the treating physicians' opinions because they were not properly supported by the medical evidence and were inconsistent with Longerman's daily activities. (R. 19, Def.'s Mem. at 3-7.)

This court finds that the ALJ erroneously credited the opinion of the state agency psychologist over the views of Dr. Kuhlman and Dr. Kurilo in evaluating Longerman's chronic migraine headaches and mental impairments. An ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) it "is not inconsistent with the other substantial evidence" in the case. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). This rule takes into account the advantage the treating physician has in personally examining the claimant, while controlling any bias the treating physician may develop, such as a friendship with the patient. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). On the other hand, if well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. *Id.* at 376. At that point, "the treating physician's

evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. An ALJ must offer "good reasons" for discounting the opinion of a treating physician. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011).

In deciding how much weight to accord a treating physician's opinion, when controlling weight does not apply, the ALJ must consider the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion, including medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician; and (6) any other factors which tend to support or contradict an opinion. 20 C.F.R. §§ 404.1527(d); 416.927(d); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Here, the ALJ failed to offer good reasons for discounting the opinions of Longerman's treating physicians. In her decision, the ALJ accorded "no significant weight" to Dr. Kuhlman's June 2009 opinion that Longerman's headaches are disabling in part because she found that it was not supported by "medical documentation." (A.R. 21.) Longerman, however, argues that Dr. Kuhlman's opinion is, in fact, supported by extensive medical records, but as the Commissioner points out in its response, she has not cited to any of those records. (R. 19, Def.'s Mem. at 5.) While the ALJ did not explain what she meant by "medical documentation," if she was referring to medical records demonstrating Longerman's visits to Dr. Kuhlman for treatment and his medical care of her and his diagnosis, this court's review of the administrative record shows that Dr. Kuhlman's

treatment notes support his June 2009 opinion. For example, Dr. Kuhlman's treatment notes document the longitudinal nature and severity of Longerman's chronic migraine headaches since he began treating her in 1994 when she was 16 years old. (Id. at 488-89.) He consistently diagnosed longstanding chronic migraine headaches of severe intensity, which did not improve with medications. (Id. at 411, 823.) Dr. Kuhlman's notes also reflect that even though Longerman was taking four or five different narcotic and non-narcotic pain medications each day, her severe headache pain was not relieved. (Id. at 823.) His records also show that Longerman experienced migraine headaches on a daily basis. (Id.) Thus, when viewing the record as a whole, Dr. Kuhlman's notes—which document his frequent clinical observations of Longerman and his failed attempts to control her pain with medication—are consistent with his June 2009 opinion that Longerman suffers from daily chronic migraine headaches, which were largely unresponsive to various attempts at treatment. (Id. at 838, 839, 841.) The ALJ did not comment on these notes.

If in referring to "medical documentation," the ALJ meant objective medical evidence showing some type of neurological abnormality, the absence of medical evidence may be explained by the nature of migraine headaches. Migraines "do not stem from a physical or chemical abnormality that can be detected by imaging techniques, laboratory tests, or physical examination." *Stebbins v. Barnhart*, No. 03-C-0117, 2003 WL 23200371, at *10 (W.D. Wis. Oct. 21, 2003). There appears to be no specific test that can confirm the diagnosis of migraine headache. *Id.*; *see also Tyson v. Astrue*, No. 08-cv-383, 2009 WL 772880, at *9 (W.D. Wis. Mar. 20, 2009). Instead, a physician will diagnose migraine

headaches when certain clinical findings are present. *Id.* These findings may include a recurrent throbbing headache of moderate to severe intensity localized on one side of the head that lasts from four to 72 hours and is associated with nausea, vomiting, or sensitivity to light, sound, or smell. *Id.*

Because there is no medical test available to confirm the presence or severity of migraine headaches, the ALJ may have improperly relied on the absence of objective medical evidence to discount Dr. Kuhlman's assessment. Although a claimant's self-reported symptoms alone are insufficient to establish disability, *see* 20 C.F.R. §§ 404.1528(a), 416. 928(a), when these symptoms are documented by a physician in a clinical setting, they are "medical signs which are associated with severe migraine headaches, and are often the only means available to prove their existence." *Stebbins*, 2003 WL 23200371, at *10 (internal quotation omitted); *see also* Social Security Ruling ("SSR") 96-4p, 1996 WL 374187, at *3 n. 2 (when a manifestation of pain is "an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom'").

Here, Dr. Kuhlman confirmed the existence of Longerman's migraine headaches when he first began treating her in March 1994. (A.R. 488.) For example, he noted that Longerman described a consistent headache she had for five or six weeks as throbbing at times and noted she had "constant bifrontal or hemicranial pain which can affect either side" of her head. (Id.) Thus, while the court cannot tell for sure, the ALJ may not have considered Dr. Kuhlman's clinical findings, which document the nature and severity of

Longerman's chronic headaches as well as his treatment regimen, as constituting medical signs supporting his opinion. (*See e.g.*, id. at 411, 413, 417, 488, 823.) *See Stebbins*, 2003 WL 23200371, at *10-11 (remanding the ALJ's decision because it was based on errors, "foremost of which was a fundamental misunderstanding of the diagnosis and treatment of migraine headaches").

The ALJ also declined to give Dr. Kuhlman's opinion controlling weight because she found it to be inconsistent with Longerman's hearing testimony and her description of the activities she reported in her October 2007 Activities of Daily Living Questionnaire. (A.R. 21, 172-79.) However, both Longerman's hearing testimony and her reported activities appear to be consistent with Dr. Kuhlman's opinion. For example, Longerman testified that she was laid off from her previous jobs because her headaches frequently caused her to be absent from work, just as Dr. Kuhlman opined that she likely would be absent from work more than three times a month as a result of her impairments. (Id. at 38, 45, 842.) Longerman also testified and reported that on those days when her headaches were not as severe or not present, she was able to do a number of activities, which included among other things, driving and taking care of children. (Id. at 41-44, 172, 174-75.) However, on those days when she experienced a severe headache, she was unable to do anything. (Id. at 39, 41, 172, 175.) Thus, Longerman's testimony and reported activities seem to be consistent with Dr. Kuhlman's opinion that, during times when Longerman had a severe headache, she would generally be precluded from performing even basic work activities and would need to take a break from the workplace. (Id. at 842.)

19

The Commissioner, however, contends that Dr. Kuhlman's opinion is contradicted by Longerman's testimony with respect to the frequency and intensity of her headaches. (R. 19, Def.'s Mem. at 3-5.) For example, Dr. Kuhlman reported that Longerman suffers from daily headaches that last from approximately one hour to eight hours and are not relieved by medications. (A.R. 839, 841.) But Longerman's hearing testimony that her headaches could last for days at times does not appear to contradict Dr. Kuhlman's opinion because he reported the *approximate* duration of Longerman's headaches. The Commissioner also argues that Longerman's testimony about her ability (even on days she has headaches) to drive and watch children is inconsistent with Dr. Kuhlman's statement that she has daily headaches lasting up to eight hours. (R. 19, Def.'s Mem. at 4.) However, Longerman testified that she tries to avoid driving on days she has a severe headache, but "sometimes it's unavoidable" because she would develop a headache after she was already out and has to return home. (A.R. 42.) She also explained that if she had a headache while she was caring for the five year-old child in question, she would simply let the child play by herself. (Id. at 43, 45.) As such, there does not appear to be a conflict between Dr. Kuhlman's opinion and Longerman's description of her daily activities. *See e.g.*, *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity").

In addition, the ALJ may have improperly credited Dr. Wharton's opinion over that of Dr. Kuhlman. The Commissioner asserts that the ALJ reasonably relied on Dr. Wharton's March 2008 opinion because her findings regarding Longerman's memory, concentration,

and forgetfulness are consistent with Longerman's testimony describing her abilities in those areas. (R. 19, Def.'s Mem. at 5.) But even if the Commissioner is correct, this court's review of the record shows that Dr. Wharton never evaluated Longerman's migraine headaches. And she is a psychologist without the qualifications to render a medical opinion. Thus, the ALJ seems to have improperly relied on Dr. Wharton's assessment to discount Dr. Kuhlman's June 2009 opinion regarding Longerman's migraine headaches. Because Dr. Wharton's assessment does not amount to a medical opinion that contradicts Dr. Kuhlman's assessment, the ALJ failed to point to some "well-supported contradicting evidence" before discounting Dr. Kuhlman's opinion. *Hofslien*, 439 F.3d at 376.

The ALJ also discounted Dr. Kurilo's July 2009 opinion regarding Longerman's depression because she found that it was not supported by medical documentation and was inconsistent with Longerman's daily activities. (A.R. 21.) While the ALJ did not identify what documentation she meant, if she was referring to treatment notes, this court's review of the record shows that Dr. Kurilo's July 2009 opinion is supported by her treatment notes. Dr. Kurilo's monthly treatment notes offer insight into Longerman's depression and associated symptoms. For example, in April 2009, she offered a diagnosis of major depression, with a GAF score of 50, continued Longerman's anti-depressant medications, and recommended that she undergo psychotherapy. (Id. at 887-88.) In May 2009, Dr. Kurilo noted that Longerman continued to have problems with motivation and feeling tired. (Id. at 885.) And in July 2009, she assessed Longerman as displaying a number of symptoms related to her depression, including very poor stress tolerance, fluctuating anxiety, and

concentration problems. (Id. at 883.) Contrary to the ALJ's conclusion, those treatment notes identify medical signs which support Dr. Kurilo's opinion. These findings are consistent with Dr. Kurilo's July 2009 opinion that Longerman suffers from major depression and has poor memory, mood disturbance, emotional lability, pervasive loss of interests, feelings of guilt or worthlessness, difficulty thinking or concentrating, decreased energy, generalized persistent anxiety, hostility, and irritability. (Id. at 845-46.) Furthermore, the ALJ also discredited Dr. Kurilo's opinion because it was inconsistent with Longerman's daily activities. However, the ALJ did not explain why her limited activities are inconsistent with her claim of disabling depression.

The Commissioner's defense of this aspect of the ALJ's decision relies on precluded post-hoc rationalizations. Here, the Commissioner asserts that the ALJ appropriately rejected Dr. Kurilo's July 2009 opinion because it is inconsistent with her short treatment history with Longerman between April 2009 and July 2009. (R. 19, Def.'s Mem. at 6-7.) For example, the Commissioner points out that Dr. Kurilo noted that Longerman did not have a history of mania, psychosis, physical aggression towards others, obsessive compulsive disorder, or panic attacks. (Id. at 6.) The Commissioner also relies on a host of Dr. Kurilo's other medical findings, including that Longerman did not exhibit any abnormal movements or a formal thought disorder, in an attempt to establish that her treatment notes are inconsistent with her July 2009 opinion. (Id. at 6-7.) But the ALJ never articulated these reasons for discrediting Dr. Kurilo's assessment and the Commissioner's after-the-fact contentions are not a substitute for the ALJ's analysis. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916

(7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Besides articulating unsupported reasons for declining to give Dr. Kurilo's opinion controlling weight, the ALJ seems to have improperly credited Dr. Wharton's opinion over that of Dr. Kurilo. Here, the Commissioner asserts that the ALJ properly relied on Dr. Wharton's opinion because she reviewed the records from Longerman's 2007 hospitalization and five months of treatment notes (the reports from Dr. Gibbons). (R. 19, Def.'s Mem. at 5-6.) The Commissioner further contends that Dr. Wharton reasonably relied on the activities Longerman reported in her October 2007 Activities of Daily Living Questionnaire because Longerman did not allege a change or worsening in her condition since that time. (Id. at 6.) Dr. Wharton's assessment of Longerman is based on a limited review of the record because it did not include Dr. Kurilo's treatment notes and her July 2009 assessment. Here, Dr. Wharton rendered her assessment in March 2008,[10] more than 15 months *before* Dr. Kurilo made her assessment. Because Dr. Wharton did not have an opportunity to review Dr. Kurilo's clinical findings that show the extent to which Longerman struggled with a significant depressive disorder and associated symptoms, her opinion is not comprehensive and does not contradict Dr. Kurilo's assessment.

---

[10] The Commissioner asserts in its response that Dr. Wharton "reviewed the record in March 2009," (R. 19, Def.'s Mem. at 5), but the administrative record shows that Dr. Wharton completed her assessment on March 16, 2008, (A.R. 635).

Even if the ALJ had articulated good reasons for refusing to give the opinions of Dr. Kuhlman and Dr. Kurilo controlling weight, the ALJ still would have been required to determine what weight the assessments did merit. *See* 20 C.F.R. §§ 404.1527(d); 416.927(d); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's speciality, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561 (citation omitted). Here, many of these considerations seem to favor crediting the assessments of Dr. Kuhlman and Dr. Kurilo: both physicians are specialists; they saw Longerman on a frequent basis, and the treatment relationship lasted anywhere from several months to years.

Based on the shortcomings in the ALJ's consideration of the opinions of Dr. Kuhlman and Dr. Kurilo, the ALJ's decision lacks a basis for concluding that she applied the correct legal standard. In crediting Dr. Wharton's opinion over the views of Dr. Kuhlman and Dr. Kurilo, the ALJ appears to have selected only those pieces of evidence that favored her ultimate conclusion. *See e.g., Binion*, 108 F.3d at 788-89; *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). On remand, if the ALJ cannot identify well-supported evidence contradicting Longerman's treating physicians, then the ALJ must accord those opinions controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). If good reasons do exist for discounting their opinions, the ALJ must apply the factors listed in Sections 404.1527(d) and 416.927(d) when deciding what weight to give those opinions. Furthermore,

while Longerman herself has not raised this issue, the ALJ must explain why she does not believe that Longerman's limitations would not require her to be off task 20 percent of the time or miss two days of work per month, which would preclude substantial gainful activity.

## B.    Credibility

Longerman argues that the ALJ erred in assessing her credibility because she improperly evaluated the credibility of her testimony only after developing her RFC finding. (R. 14, Pl.'s Mem. at 14-15.)  She also claims that the ALJ mischaracterized her daily activities by ignoring the fact that her activities were confined to days when she was not suffering from a severe headache. (Id. at 15.)  And Longerman complains that the ALJ did not consider the fact that she took multiple narcotic pain medications, which support her allegations of severe headache pain. (Id.)  The Commissioner defends that the ALJ reasonably found Longerman's testimony not credible because it was contradicted by her daily activities and the objective medical evidence of record.  (R. 19, Def.'s Mem. at 8.)

This court finds that the ALJ failed to properly assess the credibility of Longerman's testimony at the hearing.  An ALJ's credibility finding will be afforded "considerable deference" and overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted).  "A credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted).  However, where the credibility determination is based on objective factors rather than

subjective considerations, an ALJ is in no better position than the court and the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

SSR 96-7p establishes a two-step process for evaluating symptoms, such as pain. SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's pain or other symptoms. *Id.* Second, if there is an underlying physical or mental impairment that could reasonably be expected to produce a claimant's pain or other symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which the symptoms limit a claimant's ability to perform basic work activities. SSR 96-7p, 1996 WL 374186, at *2. If a claimant's statements about the intensity, persistence or functional limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of a claimant's statements based on consideration of the entire case record. *Id.*

An ALJ cannot discredit a claimant's testimony about her pain and limitations "solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted). In other words, an ALJ is not permitted to "disbelieve [a claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (citation omitted). SSR 96-7p specifically requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms,

statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

An ALJ's credibility finding will be upheld if the reasons for that finding are supported by substantial evidence. *Moss*, 555 F.3d at 561; *see also* SSR 96-7p, 1996 WL 374186, at *2 (the written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"). Without an adequate explanation, neither the claimant nor subsequent reviewers will have a fair sense of how the claimant's testimony is weighed. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001). Therefore, where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The ALJ did not find Longerman's testimony credible because it was contradicted by the medical evidence, her hearing testimony, and the activities she reported being able to do in her October 2007 Activities of Daily Living Questionnaire. (A.R. 19-20.) But as discussed above, Longerman's description of her limitations are supported by numerous medical signs and findings. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). Dr. Kuhlman repeatedly diagnosed longstanding chronic migraine headaches of severe intensity, which did

not improve with medications. (Id. at 411, 823.) His notes reflect that even though Longerman was taking four or five different narcotic and non-narcotic pain medications each day, her severe headache pain was not relieved. (Id. at 823.) And Dr. Kurilo's treatment notes and July 2009 assessment indicate that Longerman suffers from major depression with associated symptoms, has a GAF score of 55, and takes daily anti-depressants. (Id. at 845-46, 883, 885, 887-88.) Therefore, both the treating physicians' clinical observations and their treatment of Longerman support her allegations of disabling limitations. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (it was improbable that the claimant "is a good enough actress to fool a host of doctors . . . into thinking she suffers extreme pain; and . . . that this host of medical workers would prescribe drugs and other treatment for her if they thought she were faking her symptoms").

And even if Longerman's allegations of pain related to her chronic migraine headaches is not fully supported by objective medical evidence, the Seventh Circuit has instructed that if a claimant's allegation of pain is not supported by objective medical evidence and the claimant indicates that pain is a significant factor in her inability to work, the ALJ must obtain a claimant's description of her daily activities by asking specific questions about the pain and how it effects the claimant. *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (citation omitted). The ALJ is required to investigate all avenues that relate to pain, which include a claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. And the ALJ must also consider the nature and intensity of a claimant's pain, precipitation and aggravating factors, dosage

28

and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities. *Id.*; *see also Villano*, 556 F.3d at 562.

Here, the ALJ did not explain why the medical evidence does not support Longerman's claims of disabling pain and limitations. Rather, the ALJ offers Longerman's daily activities as substantial evidence to discredit Longerman's allegations of severe headache pain. This analysis, however, is not sufficient because minimal daily activities, such as those described by Longerman, do not establish that she has the ability to engage in substantial gainful activity. *Clifford*, 227 F.3d at 872. The ALJ found Longerman's claims of pain incredible because, among other things, she is able to drive and watch children on those days she has headaches. (A.R. 19-20.) However, Longerman testified that she tried to avoid driving on days she has a severe headache, but "sometimes its unavoidable" because she would develop a headache after she was already out. (Id. at 42.) She also explained that, if she had a headache while she was caring for the five year-old child in question, she would simply let the child play by herself. (Id. at 43, 45.) More significantly, Longerman testified that at least once a week she could not do anything when she suffered a severe headache. (Id. at 172, 175.) The ALJ did not address this limitation at all in her credibility determination. Thus, Longerman's testimony about her daily activities does not undermine her claim of disabling pain. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2006) (ALJ improperly equated work in the labor market to household work, including caring for children); *Carradine*, 360 F.3d at 755-56 (ALJ improperly found that the claimant could work because she could occasionally drive, shop and do housework).

29

Furthermore, the ALJ failed to consider the numerous narcotic medications Longerman took to treat her severe headache pain. Here, the ALJ never acknowledged the fact that Longerman was prescribed four or five daily pain medications (including narcotics) but, despite these medications, she continued to experience severe headache pain. The ALJ did not explain why Longerman's testimony was not credible in light of the ineffectiveness of these prescribed medications. Thus, the ALJ's failure to analyze the relevant credibility factors warrants reversal. *See Villano*, 556 F.3d at 562 (because the ALJ did not consider the factors required under SSR 96-7p, "[t]he ALJ failed to build a logical bridge between the evidence and his conclusion that [the claimant's] testimony was not credible").

Finally, the ALJ's conclusory statement that she rejected Longerman's description of her symptoms "to the extent they are inconsistent with the above residual functional capacity assessment" raises the concern that she discounted her credibility simply because her testimony did not mesh with her view of her RFC. As the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not "turns the credibility determination process on its head." *Brindisi ex. rel. Brindisi v. Barnhart,* 315 F.3d 783, 787-88 (7th Cir. 2003). The ALJ is required to assess a claimant's credibility *before* developing the RFC. *Id.* at 788. Given the ALJ's failure to properly analyze Longerman's testimony regarding her pain symptoms and daily activities, this court cannot be sure that she evaluated her credibility independently rather than dismissing her testimony to the extent it did not fit neatly within her RFC assessment. Furthermore, because the ALJ does not appear to have considered those aspects of Longerman's testimony that she

believed were not incredible or, in other words, supported Longerman's allegations of severe disabling pain, the court cannot tell that the ALJ's conclusion that Longerman is not disabled is supported by substantial evidence. Based on these shortcomings, this court cannot uphold the ALJ's credibility determination. On remand, the ALJ must reevaluate Longerman's complaints of severe pain in light of the record as a whole.

## Conclusion

For the foregoing reasons, Longerman's motion for summary judgment is granted insofar as it requests a remand and the Commissioner's motion for summary judgment is denied.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**